AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court
## For The District of Columbia

**UNITED STATES OF AMERICA**

v.

**CRIMINAL COMPLAINT**

Michele Wong
DOB:
PDID:

CASE NUMBER:
(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __from December 2005 through March 2007__ in the United States, defendant did,

unlawfully, knowingly, and intentionally to engage or attempt to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity constituting an offense under Title 21, United States Code, Sections 959, 960 and 963; and combine, conspire, confederate, and agree with other co-conspirators known and unknown to the Government, to commit the following offense against the United States: to engage or attempt to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity constituting an offense under Title 21, United States Code, Sections 959, 960 and 963

**in violation of Title 18, United States Code, Sections 1956(h) and 1957.**

**I further state that I am    Special Agent Adam Lambert   , and that this complaint is based on the following facts:**
**SEE ATTACHED AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

**Continued on the attached sheet and made a part hereof:**   ☒ Yes ☐ No

_____
Signature of Complainant
**SPECIAL AGENT ADAM LAMBERT**
**DRUG ENFORCEMENT ADMINISTRATION**

**Sworn to before me and subscribed in my presence,**

at   __Washington, D.C.__
**Date**                                                                      City and State

_____          _____
**Honorable John M. Facciola**                         **Signature of Judicial Official**
**U.S. Magistrate Judge**

# AFFIDAVIT IN SUPPORT COMPLAINT AND ARREST WARRANT

I, Adam Lambert, Special Agent, Drug Enforcement Administration, United States Department of Justice, being duly sworn, do depose and state:

1.      I have been employed as a Special Agent (SA) with the Drug Enforcement Administration (DEA) since December 2004 and am presently assigned to the Drug Enforcement Administration, Las Vegas District Office.  I have received several hundred hours of comprehensive, formalized instruction in such matters as drug identification, detection, and interdiction; money laundering techniques; and asset identification, seizure, and forfeiture. During my career I have conducted several investigations involving the unlawful importation, possession with intent to distribute, and distribution of controlled substances and money laundering, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 849, 952(a), and 963, and Title 18, United States Code, Sections 2, 371, 924, 1510, 1956, and 1957.

2.      I am presently the case agent in an ongoing criminal investigation of Zhenli YE GON related to violations of federal money laundering and drug trafficking laws. Your Affiant's investigation commenced in March 2007.

3.      The facts set forth in this affidavit are known to me as a result of my investigation and interview with agents and law enforcement officers.  These are not all the facts known to me throughout the course of this investigation, but rather only those that are essential to establish probable cause for charging a complaint against Michele WONG for the federal violations listed herein.

4.      This Affidavit is made to support a complaint charging Michele WONG with knowingly engaging or attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity; and conspiring to

knowingly engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity; all in violation of Title 18 United States Code §§ 1956 and 1957.

## PROBABLE CAUSE

5. As a result of a joint investigation between the Drug Enforcement Administration's Mexico City Country Office and Mexican authorities into the illegal importation and diversion of precursor chemicals, primarily pseudoephedrine and ephedrine, used in the manufacturing of methamphetamine, involving Zhenli YE GON (YE GON), information on several luxury vehicles and properties in Las Vegas, Nevada, in which YE GON was listed as the lien holder was forwarded to the DEA Las Vegas District Office for follow up investigation.

6. As the result of further investigation by the DEA Las Vegas District Office, a State of Nevada search warrant was executed at 2290 Casa Bella Court, Las Vegas, NV, on March 22, 2007. At that time, DEA Special Agent David Behar and I identified and interviewed Michelle WONG, who was the owner according to the title of the property, along with her mother Wah-Ling HUI.

7. WONG stated that she first met YE GON in October 2004 when she was a casino host at the Mirage Hotel and Casino in Las Vegas, NV. WONG stated that she performed host duties for YE GON while she was employed by The Mirage, and she became personal friends with YE GON during that time. WONG stated that she was fired from The Mirage in January 2005. WONG stated that she became romantically involved with YE GON in approximately February 2005. WONG stated that she has not held any other employment since she was fired from The Mirage (records corroborate that WONG was fired from the Mirage in January 2005).

8. WONG stated that while romantically involved with YE GON, he gave her

approximately one to one and a half million dollars over the course of their relationship. WONG stated that she used the money YE GON gave her to purchase jewelry, two Mercedes Benz, and her residence located at 2290 Casa Bella Court, Las Vegas, NV 89117, which was in her and her mother's name. During their relationship, WONG gave birth to a child and stated that YE GON was the father.

9.      WONG stated that in April 2005, she assisted YE GON with the purchase of equipment for his business UNIMED PHARMCHEM MEXICO, SA DE CV (hereafter referred to as UNIMED), the manufacturing plant YE GON owns in Toluca, México. This assistance included purchasing air conditioning units from York Industries and transformers from the MGM Corporation. WONG arranged to ship these items to YE GON in México, and YE GON wired her $500,000 USD to pay for the equipment. YE GON allowed WONG to keep any money left after the purchase of the equipment as a commission. WONG stated that YE GON wired the money into her Citibank account.

10.     WONG stated that around May 2006, YE GON told her that a Mexican organized crime group began blackmailing YE GON in México in March 2006. YE GON told WONG that the group told him to cooperate with them or they would kill him and his family. According to WONG, the group wanted to store cash at YE GON's residence in México City. Prior to May 2006, WONG claimed that she had believed YE GON's source of money was from UNIMED, his pharmaceutical business. YE GON told WONG that he was not personally involved in narcotics trafficking, but the people who were storing the money at his residence and threatening him were involved in narcotics trafficking.

11.     In addition to storing cash at YE GON's residence in México City, the group wanted YE GON to launder the money. YE GON told WONG that he knew the money in his house was

"dirty money" and the proceeds of narcotics trafficking. YE GON stated to WONG that he continually received threats against himself and his family, so he believed that he had to launder the money. YE GON told WONG that the group instructed him to launder the money in Las Vegas, NV, and that he should gamble with the money and purchase high value items in Las Vegas. WONG said that YE GON would frequently receive push-to-talk telephone calls on his Nextel cellular telephone from the traffickers with instructions on how to launder the funds. YE GON told WONG that the traffickers instructed him to use his bank accounts to send the money to Las Vegas where he could launder it, and that the money in YE GON's accounts at the Venetian was drug money. WONG claims that she does not know how the money was deposited into YE GON's accounts in México.

12.     WONG stated that in April 2006, when she purchased her residence located at 2290 Casa Bella Court, Las Vegas, NV, 89117, she used approximately $300,000 that YE GON gave her as a down payment. In addition, WONG stated that she paid off the mortgage within three months (July 2006) of purchasing the residence and that she again used funds YE GON had given to her to pay off the loan with a cashier's check, despite the fact that YE GON had told her that he was laundering money for Mexican narcotics traffickers. WONG stated that her mother also contributed some money for the purchase of this residence, but WONG had also given her mother some of the money YE GON had provided to her. WONG stated her mother makes approximately $2,000.00 per month from her employment. When SA Behar and I interviewed her mother, Wah-ling HUI, she told us that she did not contribute any money for the purchase of the home. We did not find any documents to verify that HUI gave WONG any money towards the purchase of the home, but was put on the title to the property for credit purposes.

13.     Title records from First American Title Company of Nevada were seized from 2290 Casa

Bella Court that detailed the purchase of said property. According to these records, WONG purchased this residence on April 24, 2006, with her mother for $1,138,000. The down payment on this residence totaled $305,108, paid with a cashier's check. WONG and HUI obtained $853,500 in loan financing to cover the purchase of this residence.

14. On May 31, 2007, we uncovered public documents showing that WONG placed the house and the land on which it sits into an irrevocable trust for the benefit of her son, Michael Ye Wong and made HUI the trustee. A quitclaim deed dated April 26, 2007 signed by WONG and HUI show the property was transferred to the irrevocable trust for no consideration. In the month prior to WONG establishing the irrevocable trust, the District Court of Nevada issued seizure warrants 2:07-MJ-00217-LRL, 2:07-MJ-00215-LRL, 2:07-MJ-00220-LRL, 2:07-MJ-00221-LRL, 2:07-MJ-00219-LRL, 2:07-MJ-00218-LRL, and 2:07-MJ-00216-LRL for property held by WONG that constitute proceeds derived from criminal violations discovered during this investigation, which included two Mercedes Benz WONG purchased in October and November 2006 with money from YE GON, $6,100 in cash WONG admitted came from YE GON, and multiple bank accounts in WONG's name and YE GON's name.

15. WONG stated that YE GON's last visit to Las Vegas ended on approximately March 9, 2007, when he flew to Orange County, California, aboard a private jet that The Venetian Hotel and Casino provided. According to WONG, Yihui (Alicia) ZHOU, an assistant and former girlfriend of YE GON, accompanied YE GON on the flight. WONG believed they were going to visit YE GON's sister-in-law in Calexico, CA. WONG said that YE GON stayed in Calexico from March 9 through March 13.

16. WONG stated that she spoke with YE GON via cell phone on March 13, 2007, and YE GON said he was still in California. WONG and YE GON spoke again on March 15 when YE

GON informed WONG that "something bad had happened and that his wife had been arrested in México." According to WONG, she has not heard from YE GON since March 15, despite numerous attempts to e-mail him. WONG also claims that YE GON's cell phone is no longer in service and that ZHOU's phone has been disconnected. WONG claims she does not know where to find YE GON.

17.     WONG later revealed to me that she had seen YE GON on March 15, 2007 outside of the Westwood Hotel in Los Angeles, CA. She also admitted that she was aware of the seizure of the money in YE GON's residence in Mexico City.

## MEXICO INVESTIGATION

18.     The U.S. DEA México City Country Office (hereafter referred to as the DEA MCCO) in joint cooperation with the Mexican Attorney General's Office Organized Crime Unit (hereafter referred to by its Spanish acronym "PGR/SIEDO") has been investigating the illicit importation and diversion of precursor chemicals, particularly pseudoephedrine, by the UNIMED and its owner, YE GON, located in México City, México.

19.     The investigation revealed that UNIMED had previously imported approximately 20 metric tons and 29.4 metric tons of "N-Methyl-Acetylamino" on December 12, 2005, and January 6, 2006, respectively; and 37.485 metric tons of "Hydroxy-Benzyl-N-Methyl-Acetethamine" on August 28, 2006, and September 2, 2006, into Mexico.

20.     According to documentation provided to Mexican Customs by UNIMED, N-Methyl-Acetylamino is a pharmaceutical intermediate chemical used in analgesic product manufacture. Hydroxy-Benzyl-N-Methyl-Acetethamine was also identified as a pharmaceutical intermediate; however documents did not describe any specific use.

21.     Based on conversations with DEA Forensic Chemists, "N-Methyl-Acetylamino" can be considered a partial chemical name; however, the chemical does not exist as it was listed on the shipping manifests nor can it be identified as an intermediate product for analgesic production. Hydroxy-Benzyl-N-Methyl-Acetethamine does not correspond to any known chemical.

22.     On December 5, 2006, UNIMED once again attempted to import 19.797 metric tons of Hydroxy-Benzyl-N-Methyl-Acetethamine which was flagged for inspection by Mexican Customs at the Pacific seaport of Lázaro Cárdenas, México. A sampling of the substance conducted by the Mexican Customs' Central Laboratory identified it as N-Acetylpseudoephedrine, a derivative of pseudoephedrine/ephedrine. This substance is controlled by Mexican federal health law as well as Mexican federal precursor law making it illegal for UNIMED to import.

23.     On April 26, 2007, DEA FC and SA Chavez traveled to the UNIMED manufacturing plant to analyze any chemicals or residues still present. This plant had been secured by Mexican authorities since the execution of their federal search warrant on March 15, 2007, to be discussed in detail herein. DEA FCs took samples of chemical residue found in equipment and locations throughout the site, including samples which tested positive for the presence of ephedrine. It is believed the plant was used for the production of pseudoephedrine/ephedrine using an N-Acetyl derivative as the starting material.

24.     I know based on my conversations with Mexican federal prosecutors and health officials that after 2005, UNIMED pharmaceutical did not have any authority to import, manufacture, distribute, or possess any pseudoephedrine or ephedrine related material. Based on the expert conclusions drawn by the DEA FCs and the importation records of the N-Methyl-Acetylamino and the Hydroxy-Benzyl-N-Methylacetethamine, I believe based on the mislabeling of shipments

and positive results for the presence of ephedrine, that YE GON willfully intended to import a restricted chemical into México, violating Mexican law, for the express purpose of manufacturing pseudoephedrine/ephedrine, a listed chemical, as defined by Title 21 United States Code Section 802(34).

25.     In consultation and interviews with current and former advisors to the Mexican Federal Commission for the Protection Against Sanitary Risks (hereafter referred to by its Spanish acronym, "COFEPRIS"), they expressed that UNIMED, as a pharmaceutical wholesaler, did not have any legal authority to import, export, manufacture, or distribute any product containing pseudoephedrine or ephedrine.  COFEPRIS also indicated that all legitimate pharmaceutical laboratories operating in México must go through COFEPRIS to obtain permits to buy and/or sell pseudoephedrine/ephedrine.  This Commission is charged with oversight and regulatory control over all pseudoephedrine/ephedrine, imports, exports, and distribution within Mexican territory.

26.     Based on the aforementioned information, it is clear that YE GON and UNIMED intentionally imported and manufactured pseudoephedrine/ephedrine for illegal purposes due to the fact that 1) UNIMED did not have the proper authority to import, export, distribute, or posses any such product and 2) no legitimate pharmaceutical manufacturer would risk criminal liability in purchasing such products from UNIMED.  Thus, I believe these large quantities of pseudoephedrine/ephedrine from the start were destined for the only other market which would require such quantities:  the clandestine methamphetamine manufacturing market.

27.     I know based on my training, experience, and conversations with other law enforcement officials both in the United States and México, clandestine methamphetamine laboratories over the past three years have increased significantly in México while decreasing in the United States.

This has been due to tighter international regulations on the control of precursor chemicals such as pseudoephedrine/ephedrine, and aggressive law enforcement activity in the United States against clandestine methamphetamine laboratories.

28.     In approximately 2004, the United States saw a significant increase in methamphetamine seized at the United States-México border indicating that more methamphetamine is coming from México to the United States.  This coincides with Mexican intelligence which identifies a larger clandestine methamphetamine laboratory presence, including recent seizures in 2006 of the two largest clandestine methamphetamine laboratories in the Western Hemisphere.[1] Investigation into these clandestine methamphetamine laboratories identified links that conclude that methamphetamine produced there was ultimately destined for the United States. Additionally, these laboratories were located along traditional transportation routes used by Mexican traffickers to transport drugs to the United States.

29.     Also in 2004, México undertook aggressive measures to apply existing law for precursor chemicals to dampen what was suspected to be large amounts of criminal diversion, particularly that of pseudoephedrine and ephedrine for clandestine methamphetamine laboratories.  While it always illegal to import and divert pseudoephedrine/ephedrine, Mexican authorities applied sections of the law that allowed only pharmaceutical laboratories, not wholesalers, access to deal in pseudoephedrine/ephedrine under tight, documented regulations.  These steps created a lucrative black market for pseudoephedrine/ephedrine among methamphetamine manufacturers.

Potential Illicit Earnings

30.     I know based on my training and experience, conversations with DEA FCs, other DEA

---

[1] Both clandestine laboratories were discovered on the outskirts of Guadalajara, Jalisco, México, in January 2006 and December 2006.  Combined, these laboratories were capable of producing thousands of pounds of methamphetamine on a regular basis.

Special Agents, and the evidence mentioned herein, that N-Acetylpseudoephedrine is a derivative of pseudoephedrine/ephedrine that can be converted back into pseudoephedrine/ephedrine at a conservative ratio of approximately 1:0.6 (i.e. one pound of N-Acetylpseudoephedrine would yield 0.6 pounds of pure ephedrine).  At this rate, YE GON and UNIMED's total importations of suspected N-Acetylpseudoephedrine totaled approximately 86.885 metric tons which conservatively converts into approximately 52,240 kilograms of pseudoephedrine/ephedrine.  I also know based on my training and experience that this illegal importation is likely to be used for the manufacture of methamphetamine.  Based on my experience, a conservative yield of methamphetamine is at least 70% of the amount of pseudoephedrine/ephedrine used, thus potentially producing an amount of approximately 36,568 kilograms of pure methamphetamine.

31.     Furthermore, based on my training and experience and from information gathered from other agents, I know the current black market prices for one kilogram of pseudoephedrine/ephedrine in México is approximately $3,200 to $4,000 USD and prices for a kilogram of methamphetamine in the United States is $17,600 to $22,000 USD.  Therefore, the suspected sale of UNIMED's illegal importations of N-Acetylpseudoephedrine could have resulted in a monetary gain of approximately $188,064,000 USD.  Anticipated future sales of finished methamphetamine in the United States would yield approximately $724,046,400 USD.

Enforcement Activity in México

32.     In early March, PGR/SIEDO solicited and received authorization to execute federal search warrants at YE GON's residence, UNIMED's corporate headquarters, both in México City, and UNIMED's pharmaceutical plant, located in Toluca, México.

33.     Upon execution of the search warrant at YE GON's residence, PGR/SIEDO federal prosecutors and agents identified $205,564,763 in US Dollars; $39,010 in U.S. traveler's checks; and another $2,000,000 US dollars worth of various foreign currencies, hidden in various compartments, false walls, suitcases, and closets.  Based on my training and experience, I know that drug and chemical traffickers routinely collect large amounts of bulk cash from their illicit activity and store it while the money slowly gets introduced into the legitimate market.

34.     Additionally, jewelry and luxury vehicles purchased for or by YE GON, were located and seized, many of which included receipts indicating payment in US dollars to stores in the United States.  Furthermore, documentation from various Las Vegas, Nevada, casinos including player's club identifications and purchases from designer stores within Las Vegas casinos were located and seized.  Seven weapons were also located and seized including multiple handguns and a fully automatic AK-47 assault rifle, and multiple boxes of ammunition.

35.     Following the execution of the federal search warrant at UNIMED's corporate headquarters, federal attorneys and agents located and seized an additional $111,000 USD as well as documentation regarding several bank accounts located in the United States, China, and Hong Kong, as well as wire transfer confirmation pages from *casa de cambios* to banks throughout the United States and Europe.[2]

36.     Also found was a handwritten note addressed to YE GON in Spanish with the following text, "Zhenli, I hope that you are fine, due to the detention of the flour, my associates and I had

---

[2]. *Casas de cambios* are Mexican money exchange houses which are used legitimately to convert currencies and wire money both domestic and internationally.  From a law enforcement standpoint, these *casa de cambios* have been widely used by drug trafficking organizations in México and South America to insert their illegal drug proceeds into the legitimate world financial systems in an attempt to disguise the origin of the money and launder its criminal history.  In this case records indicate that money brought to these exchange houses by YE GON or on his behalf were in U.S. dollars and not for exchange, but rather for wire transfers to various U.S. and European banks accounts.

some problems and had to spend the three books that you provided us. I am fine now and have contact with customs. Call me to work." The note contained a cellular telephone number and was signed "Amigos".[3] SA Chavez is fluent in Spanish and can speak, read and write it, and he provided me with this information. Based on my training and experience, I know it is common among drug traffickers to use code words to attempt to disguise their illicit activity. Based on my training and experience as an undercover agent and applying that expertise to this document, I believe "flour" maybe a code word for N-Acetylpseudoephedrine seized in December 2006 and "books" may refer to the money that YE GON had provided these individuals. The writer makes reference to having "contact with customs", possibly referring to a cooperating individual within customs who can facilitate future movements of illicit goods.

37. Based on the aforementioned history of illegal precursor importations; UNIMED's explicit intent to manufacture pseudoephedrine/ephedrine; the absence of a legitimate market for YE GON to sell the illegally manufactured pseudoephedrine/ephedrine, the substantial potential illicit profit earned by selling to drug traffickers; the amount of cash, luxury vehicles, jewelry, and weapons found during the search warrants; and also based on my training and experience, I believe Zhenli YE GON was using his company, UNIMED PHARMCHEM MEXICO, SA DE CV, to illegally import pseudoephedrine/ephedrine derivatives to manufacture pseudoephedrine/ephedrine in order to sell these restricted precursors to illicit methamphetamine manufacturing organizations operating in México for ultimate distribution and consumption in the United States.

---

[3] The original Spanish text of the note reads: *Zhenlin: Espero que se encuentre bien, a raíz de que detuvieron la harina, mis compañeros y yo tenemos algunos problemas por lo que tuvimos que gastar los tres libros que nos obsequio, ahorita ya estoy bien y tengo contacto en la aduana. Lamame para trabajar. Celular 0445529575116. \*\*\*Atte AMIGOS"*

38. According to records obtained from various hotels and casinos in Las Vegas, NV, YE GON's net gambling activity from 2004 to 2007 resulted in the loss of approximately more than $125,917,839 USD.

## **CONCLUSION**

38. Based on the information in this Affidavit, I believe that probable cause exists to believe that Michele WONG, did knowingly and intentionally combine, conspire, confederate, and agree with other co-conspirators known and unknown to the Government, to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from a specified unlawful activity in violation of Title 18, United States Code, Sections 1956 and 1957.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

                                                                          _____
                                                                          Adam Lambert
                                                                          Special Agent
                                                                          U.S. Drug Enforcement Administration